# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| EMPIRE LUMBER CO., a Washington corporation d/b/a KAMIAH MILLS, | Civil No. 3:10-cv-00533-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT FOR PUNITIVE DAMAGES AND OTHER ALLEGATIONS (Docket No. 21)** |
| INDIANA LUMBERMENS MUTUAL INSURANCE COMPANY, an Indiana corporation and a division of the ILM Group, THE ILM GROUP, and JOHN DOES I to V, | **DEFENDANT'S MOTION TO STRIKE ALL, OR IN THE ALTERNATIVE PORTIONS, OF THE AFFIDAVIT OF JEFFREY O'NEILL (Docket No. 47)** |
| Defendants. | **DEFENDANT'S MOTION TO STRIKE ¶ 11 OF THE AFFIDAVIT OF DAVID KLAUE (Docket No. 48)** |
| | **DEFENDANT'S MOTION TO STRIKE EXPERT REPORT OF GARY REIMER (Docket No. 64)** |

Currently pending before the Court are: (1) Plaintiff's Motion for Leave to Amend Complaint for Punitive Damages and Other Allegations (Docket No. 21); (2) Defendant's Motion to Strike All, or in the Alternative Portions, of the Affidavit of Jeffrey O'Neill (Docket No. 47); (3) Defendant's Motion to Strike ¶ 11 of the Affidavit of David Klaue (Docket No. 48); and (4) Defendant's Motion to Strike Expert Report of Gary Reimer (Docket No. 64). Having

**MEMORANDUM DECISION AND ORDER - 1**

carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. <u>GENERAL BACKGROUND</u>

On November 4, 2008, a catastrophic fire destroyed buildings, equipment, and machinery at Plaintiff Empire Lumber Company's ("Empire Lumber") sawmill in Weippe, Idaho. Defendant Indiana Lumbermens Mutual Insurance Company ("ILM") had issued a policy to Empire Lumber to cover such losses. This is a bad faith lawsuit, which primarily concerns the valuation of certain property destroyed in the fire. However, Empire Lumber also contends that ILM's alleged mishandling of its loss claim was so egregious as to justify a claim for punitive damages, and Empire Lumber asks the Court to allow an amendment of its pleadings to add such a claim. ILM opposes that request, and seeks to strike two affidavits offered in support of Empire Lumber's amendment efforts. Additionally (and independent of the parties' arguments relative to the punitive damages issue), ILM argues that Empire Lumber's expert, Gary Reimer, failed to comply with FRCP 26's reporting requirements and, therefore, his expert report should be stricken.

## II. <u>DISCUSSION</u>

**A.**   **Plaintiff's Motion for Leave to Amend Complaint for Punitive Damages and Other Allegations (Docket No. 21)**

"A prayer for punitive damages is not a stand-alone cause of action, but flows from an underlying cause of action, such as a breach of contract or a tort, when the conduct of a party meets the threshold level of being oppressive and outrageous." *See Boise Tower Associates LLC v. Washington Capital Joint Master Trust*, 2006 WL 1749656 at *12 (D. Idaho 2006). Conduct justifying punitive damages requires "an intersection of two factors: a bad act and a bad state of

**MEMORANDUM DECISION AND ORDER - 2**

mind." *See Linscott v. Rainier Nat. Life Ins. Co.*, 606 P.2d 958, 962 (Idaho 1980). The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of - or disregard for - its likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberately, or willfully. *See Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004). A party seeking to add a claim for punitive damages must show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* I.C. § 6-1604(2).

Much of the parties' extensive briefing to date highlights the very real controversy that exists over the cash value of the fire loss. The Court does not take up that dispute here, except insofar as it is implicated by Empire Lumber's request to add a punitive damages claim against ILM – the focus of this Memorandum Decision and Order. Anchoring its argument in this second respect, Empire Lumber contends that, within two months after the fire, ILM determined on its own that Empire Lumber had suffered $9,429,000 in covered losses. Empire Lumber further contends that (other than an up-front $200,000 payment to Empire Lumber in November 2008 to cover miscellaneous expenses), ILM unnecessarily delayed making further payments to Empire Lumber while at the same time obtaining payments from its own reinsurers on the false representation to such reinsurers that ILM had paid Empire Lumber, and that ILM then used those monies for its own use in the interim. *See generally* Pl.'s Mem. in Supp. of Mot. to Am., pp. 3-11 (Docket No. 21, Att. 2).

Of particular significance to the pending motion, Empire Lumber more specifically alleges:

**MEMORANDUM DECISION AND ORDER - 3**

- As of December 2, 2008, Cunningham Lindsey (a professional appraisal firm hired by ILM) recommended payment in the amount of the appraised actual cash value amount. *See* Ex. 11 to Thompson Dep., attached as Ex. A to Brown Aff. (submitted via CD) ("We recommend issuing payment to the insured for the [actual cash value] amount of the building [$9,429,000] less any advances and deductible to be applied to this loss.").

- On or around April 1, 2009, ILM's Randy Thompson (ILM's claims adjuster with primary responsibility for adjusting Empire Lumber's claim) made note that the market value appraisals put the claim value at $9,429,070. *See* Ex. G to Mandt Aff. (Docket No. 21, Att. 9). That same day, Mr. Thompson requested, and appears to have received, authorization from ILM management to pay $7,500,000 on Empire Lumber's claim. *See id.*

- On or around April 9, 2009, ILM's Randy Thompson submitted a reinsurance proof of loss to Arch Reinsurance, one of ILM's reinsurers, representing that ILM had paid $7,700,000 on the loss against a reserve retention of $6,000,000, making a reinsurance recovery of $1,700,000 due to ILM from Arch Reinsurance.[1] *See id.* Up to that point, however, ILM had paid only $200,000 to Empire Lumber.

- Accompanying the reinsurance proof of loss to Arch Reinsurance were copies of two consecutively-numbered checks – 741297 and 741298 – dated April 1, 2009, drawn by ILM, and made payable to Empire Lumber in the amounts of $2,500,000 and $5,000,000 respectively. *See* Ex. H to Mandt Aff. (Docket No. 21, Att. 9). Such checks appeared to evidence payment to Empire Lumber in those amounts, but the checks were never delivered to Empire Lumber. ILM had only paid Empire Lumber $200,000 as of April 1, 2009.

- Adding to the original $200,000 payment, on or around April 24, 2009, ILM paid Empire Lumber $5 million on its loss. *See* Pl.'s Mem. in Supp. of Mot. to Am., p. 9 (Docket No. 21, Att. 2).

- On May 14, 2009, Holborn Corporation e-mailed ILM's Randy Thompson, inquiring whether "Indiana Lumbermens claim on the Empire Lumber loss [is] concluded" and "[i]f it's still open, what's been paid so far and how

---

[1] On or around April 2, 2009, ILM's Randy Thompson submitted a similar reinsurance proof of loss to Holborn Corporation, ILM's reinsurance intermediary, noting that ILM had paid $6,000,000 on the loss against a retention of $1,000,000, making a reinsurance recovery of $5,000,000 due to ILM. *See* Ex. J. To Mandt Aff. (Docket No. 21, Att. 9).

**MEMORANDUM DECISION AND ORDER - 4**

much reserve do you still have on it?  *See* Ex. 36 to Thompson Dep., attached as Ex. A to Brown Aff. (submitted via CD).  The next day, Mr. Thompson replied that the file was still open and that "[w]e have paid $7,700,000 to date" and that "[t]he outstanding reserve is $1,300,000.  *See id*.  Up to that point, however, ILM had paid only $5,200,000 to Empire Lumber.

- In November/December 2009, ILM paid Empire Lumber $2,500,000 on its loss.  *See* Pl.'s Mem. in supp. of Mot. to Am., p. 10 (Docket No. 21, Att. 2).

- In May 2011, ILM paid Empire Lumber the remaining $1,895, 564.64 on its loss.  *See id* at pp. 10-11.

It may be true, as ILM points out in its opposition to Empire Lumber's Motion to Amend, that ILM ultimately paid certain amounts to its insured, Empire Lumber.  *See* Def.'s Opp. to Pl.'s Mot. to Am., p. 27 (Docket No. 45).  However, this misses the point.  At issue here is not whether Empire Lumber was once-and-for-all paid for its losses stemming from the November 4, 2008 fire; instead, the issue is the manner in which ILM managed Empire Lumber's claim preceding such payments – not only with respect to the *timing* of ILM's payments to Empire Lumber, but also with respect to the parties' disputed actual cash value of the losses.  Indeed, viewed in such terms, this represents the very core of Empire Lumber's bad faith claim against ILM.  In other words, such a claim exists independent of whether Empire Lumber was actually paid for its losses.

Hence, Empire Lumber's Motion to Amend addresses a more nuanced question – one focusing more closely on ILM's conduct in processing Empire Lumber's claim, and distinct from  ILM's overall liability.  Viewed through such a lens, the Court cannot ignore the fact that the proferred evidence strongly infers that ILM falsely represented to its reinsurers that it had made certain payments to Empire Lumber when, in fact, it had not.  *See supra*.  This problematic incongruity was further highlighted in ILM's responses to Empire Lumber's discovery:

**MEMORANDUM DECISION AND ORDER - 5**

INTERROGATORY NO. 16: Please set forth with specifics the written computation of how the defendant has arrived at what it believes to be the loss evaluation of the plaintiff's claim in this matter plus interest that has accrued.

**ANSWER: See Response to Request for Production No. 43, above. Defendant based its loss evaluation essentially on an updated (from 2007) appraisal prepared by Wheeler, and then reviewed by other entities. Buildings, machinery and equipment totaled $9,429,000. To this was added demolition costs of $115,000 as presented by Plaintiff. Deductible of $100,000 was subtracted.** *On or before April 1, 2009, Defendant had paid against this calculation the total amount of $7,700,000.* **The final payment made on May 1, 2011, in the amount of $1,895, 564.64 included interest at 12% from the date of the last proof of loss (presented by Plaintiff) to March 8, 2011, or $151,561.64. Plaintiff has been paid the total amount of $9,628,968.90, which total also includes a line item "Loss Adjusting Expenses" of $33,404.26.**

*See* Ex. 1 to Thompson Dep., attached as Ex. A to Brown Aff. (submitted via CD) (bold in original, italics added).[2] Empire Lumber contends that this is yet another misrepresentation, made under oath by ILM in this lawsuit, but not revealed until further discovery unearthed the fact of the misrepresentations made by ILM to its reinsurers about such payments, at a time when ILM had actually paid Empire Lumber only $200,000.

The significance of all this becomes apparent when, understanding that by representing to its reinsurers that it had already paid out $7,700,000 to Empire Lumber, ILM positioned itself to

---

[2] Randy Thompson did not dispute this response to Empire Lumber's Interrogatory No. 16 at his June 22, 2011 deposition. *See, e.g.*, Thompson Dep. at 35:7-13, attached as Ex. A to Brown Aff. (submitted via CD). Additionally, at his June 23, 2011 deposition, Raymond Campisi (ILM's vice president for claims) signed the verification page to ILM's discovery responses, confirming the accuracy of ILM's response to Empire Lumber's Interrogatory No. 16. *See* Ex. 44 to Campisi Dep. at 39:20-40:6, attached as Ex. B to Brown Aff. (submitted via CD). Still, on either June 23, 2011 or June 24, 2011, ILM amended its response to Empire Lumber's Interrogatory No. 16 to accurately reflect the dates of ILM's payments to Empire Lumber. *See* Ex. E to Brown Aff. (submitted via CD). ILM's counsel put the best light possible upon these facts in oral argument, contending that there was a duty to correct ILM's previous discovery responses. Nonetheless, the original and then revised discovery response are further confirmation that ILM's representations to its reinsurers that ILM had paid Empire Lumber $7,700,000 as of April 1, 2009 was just not true.

**MEMORANDUM DECISION AND ORDER - 6**

then receive corresponding funds from those reinsurers.  As ILM's secretary and treasurer, Don

Blackwell, testified at his deposition:

> Q:  Okay.  And if I understand the process, what happens is once you get above
> the one million that ILM pays out, in order to obtain funds from the
> reinsurers, "you," meaning ILM, provides a proof of loss to them at which
> time funds are transferred in from the reinsurers.  Is that a correct statement?
>
> A:  That's correct.

*See* Blackwell Dep. at 14:2-8, attached as Ex. C to Brown Aff. (submitted via CD).  In turn,

these funds are then typically passed along to the insured with minimal delay (assuming the

insured has not already been paid).  *See id.* at 21:12-18 (Mr. Blackwell testifying: "Typically,

there is no delay.  Typically, we have disbursed our funds before receipt from the reinsurers.").

Except, here, ILM not only (1) had not already paid Empire Lumber as of the date ILM

submitted its proofs of loss to its reinsurers, but ILM also (2) did not fully disperse the funds it

received from its reinsurers until December 2009.  *See, e.g.*, *id.* at 34:3-18 (Mr. Blackwell

agreeing that, as of May 12, 2009, $7,718,116 was available for payment to Empire on its loss).

Empire Lumber goes on to argue that ILM's delay in paying Empire Lumber was a function of

ILM's own financial difficulties at that time, whereby ILM deposited the funds received from the

reinsurers into its own operating business checking account to, presumably, cover it own

expenses until having to make payment(s) to Empire Lumber.  *See* Pl.'s Mem. in Supp. of Mot.

to Am., pp. 14-17 (Docket No. 21, Att. 2) (citing Blackwell Dep. at 22:4-18 & 53:23-54:5,

attached as Ex. C to Brown Aff. (submitted via CD)); *but see id.* at 51:1-12 (Mr. Blackwell

disputing ILM's "financial difficulties" in late 2008/early 2009 despite net loss in ILM's income

statement and policyholder surplus declining).

**MEMORANDUM DECISION AND ORDER - 7**

The Court is aware of, and has considered the attacks upon this evidence raised by ILM. Nonetheless, such evidence, if accepted by the jury, describes a fundamental breakdown in the relationship between an insurer, ILM, and its insured, Empire Lumber – one that cannot be explained away by a simple reference to an alleged good-faith dispute over the cash value of the fire loss.  Within one month of the fire, ILM arguably understood the minimum amount due and owing to Empire Lumber (as reflected by Cunningham Lindsey's December 2, 2008 recommendation (*see supra*)).  Still, even if it legitimately disputed Cunningham Lindsey's findings (and, relatedly, not paid Empire Lumber any money beyond the initial $200,000), ILM nonetheless represented to its reinsurers that it had already paid that same recommended amount as of April 1, 2009 by providing proofs of loss indicating as much, accompanied by evidence of the issuance of two checks totaling $7,500,000.[3]  Exactly why ILM did this is not clear, notwithstanding Empire Lumber's arguments surrounding ILM's alleged economic situation. What is clear, though, is that, upon receiving those funds from its reinsurers, ILM failed to promptly forward said funds along to Empire Lumber (at least what it thought was the minimum amount due, even taking into account any alleged 20% retention policy (*see* Pl.'s Mem. in Supp. of Mot. to Am., pp. 17-19 (Docket No. 21, Att. 2)), thereby necessarily postponing Empire Lumber's recovery from a catastrophic fire.[4]  Such conduct could convince a jury that an insurer

---

[3]  Although ILM argues that "[r]e-insurers require the initiation of the process of payment to an insured, not the completion of the transaction, in order to begin processing the re-insurance paperwork for reimbursement of the insurer (*see* Def.'s Opp. to Pl.'s Mot. to Am., p. 27 (Docket No. 45)), this does not explain why ILM's Randy Thompson prepared these two checks – checks that, according to Empire Lumber, were *never* given to Empire Lumber.

[4]  Five days after the fire, Empire Lumber's CEO, David Klaue, was badly injured in a serious car accident, resulting in several months of surgery, hospitalization, and rehabilitation. His unavailability to participate in the communications with ILM about the fire loss was known to ILM. *See* Klaue Aff., ¶ 5 (Docket No. 21, Att. 3).

**MEMORANDUM DECISION AND ORDER - 8**

is protecting itself at the expense of its insured – an obvious fracture in the non-arm's length relationship between an insurer and its insured.  *See Rouse v. Household Finance Corp.*, 156 P.3d 569, 572 (Idaho 2007) ("Idaho law recognizes a 'special relationship' between the insurer and the insured and also recognizes that this relationship requires that 'the parties deal with each other fairly, honestly, and in good faith . . . .'" (quoting *Featherston v. Allstate Ins. Co.*, 875 P.2d 937, 940 (1994)).

As such, ILM's actions in the above-referenced respects can reasonably be argued to represent an extreme deviation from reasonable standards of conduct, performed willfully and deliberately, so as to support Empire Lumber's arguments for amending its Complaint accordingly.[5]  Empire Lumber's Motion to Amend is granted.

**B.      Defendant's (1) Motion to Strike All, or in the Alternative Portions, of the Affidavit of Jeffrey O'Neill (Docket No. 47) and (2) Motion to Strike ¶ 11 of the Affidavit of David Klaue (Docket No. 48)**

ILM takes issue with the majority of Jeffrey O'Neill's affidavit and one paragraph of David Klaue's affidavit, arguing that, in both instances, the affiant is improperly testifying to matters outside of his personal knowledge.  *See* Def.'s Mem. in Supp. of Mot. to Strike O'Neill Aff., pp. 1-12 (Docket No. 47, Att. 1); Def.'s Mem. in Supp. of Mot. to Strike Klaue Aff., pp. 1-3 (Docket No. 48, Att. 1).  While ILM's objections in these respects are more-or-less well-taken, they do not affect the Court's position on Empire Lumber's underlying Motion to Amend.

---

[5]  During oral argument, the Court granted Empire Lumber's Motion to File Supplemental Declarations and Additional Evidence in Support of its Motion for Leave to Amend Complaint for Punitive Damages (Docket No. 78).  At that time, the Court indicated that, if the original Motion to Amend could be resolved without reviewing Empire Lumber's supplemental information (since responded to by ILM (Docket No. 96)), it would do so.  The Court finds that the Motion to Amend is warranted independent of Empire Lumber's supplemental materials.  Of course, at trial, the parties are permitted to offer whatever evidence they feel is appropriate to support their claims/defenses.

**MEMORANDUM DECISION AND ORDER - 9**

Preliminarily, the Court points out that the at-issue portions of Messrs. O'Neill's and Klaue's affidavits read like supplemental *argument* to Empire Lumber's Motion to Amend. This is because both individuals attempt to, first, subjectively comment upon what discovery has revealed in this action before, second, testifying as to the impact of those interpretations upon themselves individually as representatives of Empire Lumber.

The Court finds that the utilization of an affidavit in the former respect to be improper, particularly when the underlying discovery speaks for itself and any interpretation thereof is beyond the affiant's personal knowledge. This does not mean that an apparent fact cannot be introduced to an affiant for the purposes of having that affiant testify to his lack of awareness of that fact – in this case, for example, the fact that ILM represented to its reinsurers that it had paid Empire Lumber $7,700,000 as of April 1, 2009. But, for that to happen, a proper foundation for that fact must be laid before an affiant/witness can testify as to whether or not he was aware of that same fact. Thus, to the extent Mr. O'Neill and Mr. Klaue attempt to lay the foundation for the facts upon which they later testify they were unaware of, such "foundation" is improper and, in this particular instance, represents nothing more than another opportunity for Empire Lumber to make argument. The Court strikes such instances in these respects; however, where it is clear that Mr. O'Neill and Mr. Klaue are testifying only as to what they did not know following the November 4, 2008 fire vis à vis ILM's handling of Empire Lumber's claim, those instances are appropriate for the Court's consideration.

This is a fine line, to be sure, but one that the Court need not specifically delineate here when understanding that neither Mr. O'Neill's affidavit nor paragraph 11 of Mr. Klaue's affidavit was integral to the undersigned's analysis of Empire Lumber's Motion to Amend. The

**MEMORANDUM DECISION AND ORDER - 10**

Court's decision on that motion would be no different, even in the absence of the Klaue and O'Neill affidavits. Therefore, ILM's Motions to Strike, while meritorious in many respects, are denied as moot.

**C.     Defendant's Motion to Strike Expert Report of Gary Reimer (Docket No. 64)**

Following Empire Lumber's disclosure of Gary Reimer as an expert, along with production of Mr. Reimer's expert report (the "Reimer Report"), ILM seeks to strike Mr. Reimer's testimony by challenging the adequacy of the Reimer Report under FRCP 26(a)(2)(B) as follows:

> Here, the report of Plaintiff's proposed expert fails to comply with the substantive requirements of Rule 26(a)(2)(B).  Instead of a complete statement of all opinions, the Reimer Report consists of a cover letter and a list of items and figures, without explanation as to how any of them were derived.  Instead of disclosing all data and information, the Reimer Report references, in a single sentence, several hundred pages of documents without explaining which were relied upon, for which opinions they were relied upon, or how the conclusions were reached in reliance upon them. Pursuant to Rule 26(a), Rule 37(c)(1), and the case law construing these rules, the striking of the Reimer Report, and the exclusion of his testimony at trial should be "automatic and mandatory."

*See* Def.'s Mem. in Supp. of Mot. to Strike, pp. 2-3 (Docket No. 54, Att. 1).  Objecting to ILM's Motion to Strike, Empire Lumber argues that Mr. Reimer, while an expert, is not required to submit a report pursuant to FRCP 26(a)(2)(B) and, alternatively, the Reimer Report complies with FRCP 26(a)(2) in any event.  The Court agrees with Empire Lumber.

1.     <u>Experts and Whether FRCP 26(a)(2)(B) Applies</u>

Unless otherwise provided by court order or stipulation, each party must disclose the identity of expert witnesses whom it expects to use at trial to present evidence under FRE 702, 703, or 705 *and* (1) as to certain of these experts, a written report, outlining the bases for any such opinion (and several other matters (*see infra*)) in accordance with the Federal Rules of Civil

**MEMORANDUM DECISION AND ORDER - 11**

Procedure, or (2) as to experts not required to submit a written report, a disclosure of (A) the

subject matter on which the expert will testify and (B) a summary of the facts and opinions to

which the expert is expected to testify.  *See* Fed. R. Civ. P. 26(a)(2)(A),(B) & (C).  Therefore,

not every testifying expert must produce a report.  *See* William W. Schwarzer, A. Wallace

Tashima & James M. Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial

¶ 11.380, at 11-50 (The Rutter Group 2011) ("The identification requirement contained in FRCP

26(a)(2)(A) applies to a broader range of experts than does the written report requirement in

Rule 26(a)(2)(B).").  That is to say, while all persons giving expert testimony must be identified,

a party must provide written reports only for experts who are (1) retained or specially employed

to provide expert testimony at the trial of the action, or (2) employed by a party and whose duties

regularly involve giving expert testimony.  *See id.* (citing Fed. R. Civ. P. 26(a)(2)(B)).

Here, Mr. Reimer was hired by Empire Lumber in 2009 as Empire Lumber and ILM

were in the midst of negotiating the losses resulting from the November 4, 2008 fire.  *See* Pl.'s

Opp. to Def.'s Mot. to Strike, p. 3 (Docket No. 68).  On December 17, 2009, Mr. Reimer

prepared a replacement cost estimate for Empire Lumber's destroyed sawmill; that "report" was

then forwarded to ILM on or around March 29, 2010.  *See* Ex. 39 to Thompson Dep., attached as

Ex. A to Brown Aff. (submitted via CD).[6]  In other words, Empire Lumber did not hire Mr.

Reimer for the purpose of providing expert testimony in this *case* – indeed, no action had

commenced as of the date Empire Lumber first reached out to Mr. Reimer.  Instead, Mr.

Reimer's involvement in this action is that of a witness (albeit with a certain degree of expert

---

[6]  There does not appear to be a dispute that Mr. Reimer's December 17, 2009 estimate,
coupled with notebook containing supporting documentation (delivered to ILM in February 2011
and September 2011) (*see* Pl.'s Opp. to Def.'s Mot. to Strike, p. 5 (Docket No. 68)) represents
the Reimer Report – the report that ILM now objects to.

**MEMORANDUM DECISION AND ORDER - 12**

knowledge) to his own dealings with Empire Lumber in 2009 and his related replacement cost estimate – nothing more.

Mr. Reimer's role in this action is similar to that of a treating physician or other experts whose opinions (while expert in nature) are based on matters personally observed by them. *See* Adv. Comm. Note to 2010 Amendment to FRCP 26(a)(2)(C) ("A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony."). To the extent such opinions were formed during the course of their typical employ (as distinct from being specially retained for the specific purpose of giving expert testimony), those opinions (and any contemporaneous report) are not subject to FRCP 26(a)(2)(B)'s reporting requirements. *See, e.g.*, *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) ("[A] treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment."). However, the flip-side of that coin is that Mr. Reimer's testimony is strictly limited to his observations and findings as of the date of (and part and parcel with) the disputed Reimer Report. Issues in this latter respect may very well present themselves during the course of this litigation; until then, ILM's Motion to Strike is denied.[7]

---

[7] Although the Court is unaware of how, exactly, Empire Lumber disclosed Mr. Reimer, it is satisfied that, consistent with FRCP 26(a)(2)(C), the Reimer Report itself adequately highlights the subject matter upon which Mr. Reimer may testify, as well as a summary of the facts and opinions to which he is suspected to testify. It is not as polished, or glossy, as the reports of expert witnesses often appear, but those are details that Defendant is free to exploit on cross-examination and argument, it Defendant chooses to do so.

**MEMORANDUM DECISION AND ORDER - 13**

2.      FRCP 26(a)(2)(B)'s Reporting Requirements

If an expert *is* required to submit a report under FRCP 26(a)(2)(B), that report must

contain: (1) a complete statement of the expert's opinions and their bases, (2) the information

relied upon by the expert in forming the opinions, (3) all exhibits to be used to summarize or

support the opinions, (4) the expert's qualifications and list of publications, (5) a list of cases in

which the expert testified, and (6) a statement of the expert's compensation.  *See* Fed. R. Civ.

26(a)(2)(B).  Through its Motion to Strike, ILM argues that the Reimer Report (submitted to

ILM at various times since March 2010 and, most recently, on September 15, 2011, along with a

cover letter formally referencing FRCP 26(a)(2)(B) (*see* Ex. A to Schroeder Aff. (Docket No. 64,

Att. 2)) does not comply with FRCP 26(a)(2)(B) by failing to provide (1) a complete statement

of all opinions, and (2) all data and information relied upon.  *See* Def.'s Mem. in Supp. of Mot.

to Strike, p. 2 (Docket No. 64, Att. 1).  The undersigned acknowledges that the Reimer Report is

not the model of clarity; yet, even assuming he is required to follow FRCP 26(a)(2)(B)'s

requirements (*see supra*), the Reimer Report is still sufficient.

ILM characterizes the Reimer Report as "two cover letters, five pages of lists of items

and figures, and six pages of diagrams."  *See id*. at p. 7.  ILM understandably goes on to criticize

the Reimer Report's statement that: "The facts and data considered to arrive at this estimate are

provided in the backup data book.  See Bates No. 1883-2261."  *Id*.  Without more, the Court

would be inclined to agree with ILM's overall assessment that "[t]he Reimer Report primarily

consists of lists of items and dollar figures.  No explanation is given as to from where these

figures were derived, nor as to why certain items were included or excluded . . . ."  *Id*.

However, such a characterization overlooks what the Reimer Report actually entails; it is

a summary of the estimated replacement costs associated with the following categories of

**MEMORANDUM DECISION AND ORDER - 14**

rebuilding: demolition of fire damage, site preparation, foundations, buildings and enclosures, purchased equipment, mechanical installation, electrical installation, personal property, start up assistance and operator training, freight, engineering, contingency, and general contractor's mark-up.  *See* Ex. A to Schroeder Aff. (Docket No. 64, Att. 2).  These figures were compiled from the hundreds of pages of estimates included in notebooks that, according to Empire Lumber's counsel (and not disputed by ILM's counsel), have already been provided to IMI and IMI's counsel in hard copy and CD format.  *See* Pl.'s Opp. to Mot. to Strike, p. 5 (Docket No. 68).  Within these notebooks, the estimates are divided up in sections dealing with the above-referenced categories of costs so that the sum of the estimates are included within the summary portion of the Reimer Report.  *See* Exs. B1-B8 to Brown Aff. (Docket No. 68, Atts. 4-11).  Said another way, the materials making up the Reimer Report speak for the themselves such that further detail is unnecessary, as ILM now contends must be the case through its Motion to Strike.[8]

The Reimer Report will not be stricken as ILM was provided with the necessary information contemplated by FRCP 26(a)(2)(B), even assuming its application here.  There is no question that ILM disputes many of the figures provided therein and/or the assumptions that Mr. Reimer may have made in arriving upon such estimates.  *See, e.g.*, Def.'s Mem. in Supp. of Mot. to Strike, p. 7 (Docket No. 64, Att. 1) ("No explanation is given as to . . . why certain "discretionary" items seem to have been inflated, if not duplicated (e.g., a "20% contingency"

---

[8]  The Court's position in this respect is buttressed by the fact that, on June 25, 2010 (before litigation commenced), ILM's Randy Thompson wrote to Jeff O'Neill commenting upon ILM's need to contact Belfor Restoration "to assist us in preparing a competitive bid" in response to the Reimer Report.  *See* Ex. D to Brown Aff. (Docket No. 68, Att. 13).

**MEMORANDUM DECISION AND ORDER - 15**

appears at the bottom of the Reimer Report, Bates No. 2276, just above another 20% for

contractor's mark-up).").  However, any shortcomings relating to the completeness or accuracy

of the Reimer Report in such regards provide fertile ground for cross-examination during trial;

they do not justify the report's outright exclusion or Mr. Reimer's related testimony.  ILM's

Motion to Strike is denied for this alternate reason.

### III.  ORDER

Based upon the foregoing, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's Motion for Leave to Amend Complaint for Punitive Damages and

Other Allegations (Docket No. 21) is GRANTED.

2.      Defendant's Motion to Strike All, or in the Alternative Portions, of the Affidavit

of Jeffrey O'Neill (Docket No. 47) is DENIED as moot.

3.      Defendant's Motion to Strike ¶ 11 of the Affidavit of David Klaue (Docket No.

48) is DENIED as moot.

4.      Defendant's Motion to Strike Expert Report of Gary Reimer (Docket No. 64) is

DENIED.

DATED:  **September 27, 2012**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 16**