UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EMPIRE LUMBER CO., a Washington corporation, d/b/a KAMIAH MILLS, <br><br> Plaintiff, <br><br> vs. <br><br> INDIANA LUMBERMENS MUTUAL INSURANCE COMPANY, an Indiana corporation and a division of the ILM Group, THE ILM GROUP, and JOHN DOES I to V, <br><br> Defendants. | Case No. 3:10-CV-00533-REB <br><br> **MEMORANDUM DECISION AND ORDER RE: JOINT MOTION TO SEAL** <br><br> **(Docket No. 163)** |

Currently pending before the Court is the parties' Joint Motion to Seal (Docket No. 163). Having carefully considered the record and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

## I. BACKGROUND

This lawsuit involves a dispute between Empire Lumber Company ("Empire"), the owner of a large lumber mill located in Weippe, Idaho, and its fire casualty insurer Indiana Lumbermens Mutual Insurance Company ("ILM"). After a catastrophic fire destroyed the mill on November 4, 2008, a lengthy process ensued of seeking to adjust the property loss and to then obtain compensation for the multi-million dollar loss. Ultimately, significant disputes arose between Empire and ILM over the amount of the loss, and the manner and timing of payments that were made upon that loss, which led to the filing of a lawsuit in Idaho state court on September 29, 2010. The state court lawsuit was removed by ILM to federal court.

**MEMORANDUM DECISION AND ORDER - 1**

The lawsuit included breach of contract, estoppel and "bad faith" claims. A motion was made by Empire, early on in the case, to add a claim for punitive damages. (Docket No. 21). Consideration of the motion was deferred, on the motion of Defendants, to allow time for discovery and preparation of a complete response. (Docket No. 26). The lawsuit then went into a protracted discovery and motion phase, with numerous requests for discovery extensions and relaxation of briefing limits, along with the parties agreeing to and making good use of a Discovery Master. An early mediation, and later a settlement conference with a U.S. Magistrate Judge, were held, but without success. Eventually, an enormous record was developed specific to the issue of whether or not Empire should be permitted to amend its Complaint to include, *inter alia*, a claim for punitive damages, along with an array of related motions. The Court heard oral argument upon the pending motions, and issued a decision on September 27, 2012. (Docket No. 102).

Among other things, the Court permitted a claim for punitive damages to be added in the Amended Complaint. This issue was hotly contested and, as one would expect, the decision to allow the claim to go forward served to "up the ante" in the lawsuit. At some time contemporaneous to that decision, ILM brought in an additional attorney to assist the already capable counsel it had on board, specifically a Mr. Andrew W. Hull, a member of an Indianapolis, Indiana law firm.[1] The Court issued an order setting deadlines for dispositive and

---

[1] Mr. Hull penned a November 28, 2012 letter to the attorney representing the insurance agency which placed the ILM policy involved in this dispute. That letter is discussed in more detail to follow. The particular subject matter of the letter makes clear that Mr. Hull had become involved in the case for ILM at some point in time prior to the date of the letter. He made an appearance as co-counsel for ILM by way of a *pro hac vice application* filed on January 17, 2013.

**MEMORANDUM DECISION AND ORDER - 2**

other motions, and set a trial date. (Docket No. 117). The parties later requested, and the Court allowed, an extension of the motion deadlines.

ILM filed a motion for summary judgment, along with extensive supporting materials. Empire filed a motion for partial summary judgment on liability, also with extensive supporting materials. The parties continued to have settlement discussions, and scheduled another mediation to take place in Seattle, Washington.

In the midst of these events – which were occurring at the tip of the lawsuit iceberg and therefore reflected in the Court's docket – there were other events of an apparently increasingly incendiary nature occurring behind-the-scenes, as sometimes happens in high-stakes litigation. Eventually, some particulars of those behind-the-scenes actions found their way to the docket, in the form of several different filings from Empire, and then ILM. On February 27, 2013, the day before the Seattle mediation was scheduled to begin, Empire filed a "Motion for Order to Show Cause Why Defendant Should Not be Held in Contempt of Court's Order" (the "Contempt Motion"), supported by a memorandum and 12 exhibits, containing various pieces of evidence drawn from the records of Empire and from the discovery process in the lawsuit. (Docket No. 116). The Motion contended that the Defendant ILM had violated provisions of a stipulated Confidentiality Order that had been entered into early on in the case (Docket No. 20), and further contended that ILM had engaged in witness intimidation in violation of Idaho criminal statutes.

The genesis of this motion, according to Empire, was a November 28, 2012 letter written by Mr. Hull to the attorney for the Moloney O'Neil insurance agency in Spokane (the "Hull Letter"). (Docket No. 116, Att. 3). The Moloney O'Neil insurance agency, which was an agency contractually entitled to sell policies for ILM, had placed the pertinent insurance

**MEMORANDUM DECISION AND ORDER - 3**

coverage on behalf of Empire with ILM. Mr. Jeffrey O'Neil, one of its principals, had been deeply involved in the attempts to resolve the amount of the loss and obtain compensation for the same. (Mr. O'Neil is also the nephew of David Klaue, the CEO of Empire.) In that letter, Mr. Hull – on behalf of ILM – asserted that the Moloney O'Neil agency had breached contractual and fiduciary duties owed to ILM, that the agency through its principals had been duplicitous in its dealings with ILM in the handling of the Empire claim, that Jeffrey O'Neil had been untruthful under oath during his deposition taken in the case, that the agency through its principals had assisted the attorney for Empire in his preparation of the case against ILM (in violation of their duties to ILM)I was, that the principals of the agency had engaged in the "unauthorized practice of law" in violation of Idaho law, and that the agency through its principals was complicit with Empire in presenting an "improper" and "unfounded" claim to ILM for losses suffered in the lumber mill fire. In this letter, Hull demanded on behalf of ILM that the agency provide a defense for and indemnification of ILM as to "extracontractual or punitive damages" sought by Empire. Hull said that under its contract with ILM, the Moloney O'Neil Agency was required to maintain $5,000,000 in errors and omissions coverage, and he "instructed" the agency to notify its own insurers of that demand, and asked for copies of policy limits and declaration pages to be provided to him within five days. Finally, Hull stated in his letter that a mediation was expected to take place in February of 2013, and that "we expect your clients, together with representatives for their insurers, to plan to attend and fully participate at that mediation."

    Whatever other purpose may have been served by the Hull Letter, it was viewed by Empire and its counsel as an attempt to threaten and intimidate two witnesses from the insurance

**MEMORANDUM DECISION AND ORDER - 4**

agency who were critical to its case against ILM, leading to the filing of the Empire motion referenced above. If the Hull Letter formed the kindling of a fire, Empire's motion lit the match. The Contempt Motion and its supporting materials contain indignation, pique, incredulity, and a renewed and extensive paper drumbeat regarding the various alleged examples of nefarious conduct committed by ILM which had led to the filing of the original Complaint and the later added claim for punitive damages. But also included in the Contempt Motion were allegations that ILM and its counsel had violated Idaho *criminal* law by seeking to intimidate witnesses through the claims and demands in the Hull Letter, and that ILM and its counsel had violated this Court's Order implementing the parties' proposed Stipulation for Entry of a Protective Order by disseminating information designated as confidential under that Order in a manner not permitted by its terms.

Some weeks later, in March of 2013, the parties jointly requested that the deadline for ILM to respond to the Contempt Motion be stayed, while the parties continued to discuss a possible settlement of the case. The Court agreed to such abeyance (Docket No. 126), but required the parties to submit a written status report on the progress of any such discussions and related matters in the near future. The Court also emphasized to counsel that there would be no continuance of the trial setting set for October 2013.

Although there were further settlement discussions between the parties, and although the parties asked for several extensions of the deadline for their status report, there was no settlement reached in that time period. ILM then filed its own barrage of briefing, declarations, and exhibits in response to the Contempt Motion. (Docket Nos. 146, 147, 148). Not surprisingly, ILM's counsel took umbrage to the Contempt Motion, as Empire's counsel had done to the Hull

**MEMORANDUM DECISION AND ORDER - 5**

Letter. Much of the memorandum in opposition is devoted to detailing the basis for the claims in the Hull Letter. Further, ILM argued that allowing Mr. Hull to review documents from the case was entirely appropriate under the very terms of the Protective Order, because his letter had made a "demand for defense and participation in a settlement conference" and the Protective Order permitted access by other persons to Confidential Information (as defined in the Order) "to the extent necessary to assist in the prosecution, defense, settlement, or appeal of this action." (Docket No. 146). ILM also argued that it was unreasonable to suggest that ILM had violated the Confidentiality Order because Empire had already been publicly disclosing such information, on a repeated basis, in the filings it had made with the Court. *Id.*

Both Mr. Hull and Mr. Schroeder filed declarations. Mr. Schroeder appended a goodly number of exhibits to his declaration, totaling nearly 700 pages of copies of email communications, deposition testimony, and other materials from the lawsuit. Mr. Hull and Mr. Schroeder both disclaimed any intention to intimidate witnesses, and explained in exhaustive detail their position as to why information was already in the public record from the filings made by Plaintiff, why the use of the information referenced in the Hull Letter did not run afoul of the Protective Order, and provided additional facts and arguments as to the particulars of what the Court will characterize for these purposes as the alleged "bad acts" of the principals of the Moloney O'Neil Agency, which were the subject of the Hull Letter.

At a yet later date, while Empire's Contempt Motion was pending, the parties asked the Court to hold off on any decision on the Contempt Motion, as the parties were continuing to discuss settlement. In the meantime, as all of these events were transpiring, the briefing on the also pending motions for summary judgment, or partial summary judgment, filed by both sides,

**MEMORANDUM DECISION AND ORDER - 6**

was enlarged upon and supplemented. Motions to exclude, or to strike, were filed. Pending motions were scheduled to be heard in Coeur d'Alene on May 20, 3013. On May 19, 2013, the parties advised the Court that a settlement of the case had been reached. The parties requested a telephone status conference with the Court, to discuss the fact of the settlement and a particular issue that they wished to raise concerning the Contempt Motion and the filings made by the parties relating to that motion. The Court conducted a telephone status conference with counsel on May 22, 2013.

During the May 22, 2013 telephone status conference, the parties confirmed the fact of the settlement, agreed that the settlement agreement paperwork, including a stipulation for dismissal of the lawsuit, would be completed by July 19, 2013. The parties also told the Court that Empire had agreed to withdraw its pending Contempt Motion, and any related filings, and that ILM had agreed to withdraw its opposition to that motion, along with any related filings. In light of their decision to withdraw such documents, the parties requested that the Court issue an order sealing such documents, to effectively remove them from the public record of the case.

The Court ordered that the request be made in the form of a motion, with an supporting memorandum of law, at which point the Court would consider the arguments made by the parties to support the request, and the Court would then issue a decision upon the motion. On July 13, 2013, attorneys for ILM filed a "[Joint] Motion to Seal Docket No. 116-0 through Docket No. 116-12; Docket No. 127-1 Page 10; Docket No. 127-38; Docket No. 127-39; Docket No. 135; Docket No. 146; Docket No. 147; Docket No. 148-0 through Docket No. 148-21; Docket No. 150; Docket No. 151; Docket No. 155-0 through Docket No. 155-2" (the "Motion to Seal") and a supporting Memorandum of Law. (Docket Nos. 163, 164). A joint Motion to Dismiss, with

**MEMORANDUM DECISION AND ORDER - 7**

Prejudice, was filed on July 17, 2013. (Docket No. 166). Because of the nature of the request, the Court sealed the pertinent filings in the docket until a decision upon the parties' motion was made, at which time the Court would either unseal the documents or issue an order sealing them for future purposes.

The Court entered its Order dismissing the case, with prejudice, based upon the stipulation of the parties, on August 6, 2013. (Docket No. 167). In doing so, the Court kept the case open for the limited and sole extent of issuing this decision and order on the pending Joint Motion to Seal.

## II. ANALYSIS AND RULING

In their Motion to Seal, the parties argue as a threshold matter that the parties have "voluntarily withdrawn all these pleadings," and characterize the Contempt Motion (Docket No. 116) which is at the center of all such filings as a "non-dispositive" motion. The parties go on to argue that such documents did not "play a role in the adjudicative process," and therefore, are not considered judicial records subject to a right of access by the public.

Although the fact that the Contempt Motion, and its related supporting and opposing documents have been "withdrawn" by the parties is of some significance in regard to the analysis of whether or not they should be sealed, that action by the parties is not self-executing. There is no unilateral right on the part of any litigant to remove or seal a document in the judicial records, once that document has been filed. Certainly a party can inform the Court that it no longer intends to press a particular claim or motion previously filed, or to continue to assert a particular defense or argument already made; however, the fact of such a claim or motion, or defense to the same once made, is always a matter of record as having been made.

**MEMORANDUM DECISION AND ORDER - 8**

The issue of whether the documents are "judicial records" is of some significance, as the standard by which the Court considers whether to seal a document from public view turns in part upon the nature of the document in the context of the case before the Court. It has long been an established principle of federal common law, with constitutional underpinnings, that the records of federal court lawsuits are presumed to be open and available for anyone to see. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). A party seeking to seal a judicial record must overcome that presumption, by "articulat[ing] compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Id.*, at 1178-79 (citations omitted). Conjecture or hypothesis cannot be used to support a request to seal a judicial record. *Id*. Further, the possibility that disclosure of a judicial record might embarrass, incriminate or create further litigation for a party does not justify sealing that record. *Id.*

Generally, issues about whether documents should be sealed come before the Court at the time a document is filed, when a party – cognizant of the general rule that once filed, available to all – moves the presiding court to seal all or some portion of a document that is to be, or is contemporaneously being filed with the Motion to Seal. Sometimes the issue is even anticipated at an earlier time in the case, as part of some stipulated protective order that permits a party to designate certain types of information as confidential, and then for all parties to treat such information as confidential going forward, unless an objection is raised by an opposing party with the court sometimes then asked to make a ruling. In any setting, however, it is the applicable law relating to the presumption of open court records that governs; the parties do not

**MEMORANDUM DECISION AND ORDER - 9**

have the right to self-designate whether a document filed with the Court is a public or confidential record. In this case, neither party made any request to seal any portion of the voluminous array of documents – briefing, declaration, or exhibits – that was filed as part of or in response to the Contempt Motion, at the time (or after contemporaneously becoming aware that) such documents were filed.

An extensive array of judicial decisions from the federal appellate and trial courts describe and affirm the presumptively public nature of court records, and there need not be a recitation of those decisions here. Significantly, assuming that the records in question are judicial records subject to that presumption, there is nothing readily apparent in the record of this case and, in particular, the record of the filings related to the Contempt Motion, to indicate a compelling reason for overcoming that presumption. The difficulty of meeting that standard is even more evident when considering that any decision to seal the documents would require an individualized examination of each document sought to be sealed, along with a weighing of the competing interests at play, followed by a decision narrowly tailored to preserve confidentiality only where a compelling confidentiality interest exists. *E.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07 (1982). The argument raised by the parties in support of the Motion to Seal simply doesn't bear the weight of that burden, if the presumption applies.

Nonetheless, there is a distinction drawn in some of these decisions, as described in the joint Motion to Seal, based upon the particular nature of the records in the context of the issues at play in the lawsuit. As noted at the outset, the parties characterize the Contempt Motion and its myriad related filings, as a "non-dispositive" motion. They further argue that records connected with any non-dispositive motions are considered differently than other judicial

**MEMORANDUM DECISION AND ORDER - 10**

records, for purposes of a motion to seal, with a party only required to show "good cause" to justify sealing the record.

It is correct to say that the public's interest in the merits of a non-dispositive interest is different than as with a dispositive motion – with dispositive motions, there is a compelling interest in ensuring that the public understands how the judicial process operates to decide a motion (and often, in such a motion, the case itself) on its merits. The records associated with a non-dispositive motion, on the other hand, may be only indirectly connected to the central issues of the lawsuit, "such that the usual presumption of the public's right of access is rebutted." *Id.* (citing *Phillips v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002)). The parties contend that the Contempt Motion is in this latter category. The parties additionally argue that the Contempt Motion and related filings are not "judicial records" in any event, because "they have not been the subject of adjudication by this Court." (Docket No. 164).

It is not readily apparent where to categorize the Contempt Motion. The parties argue that it is a non-dispositive motion because it involves a discovery dispute (the question of whether or not ILM violated the Protective Order by disseminating documents designated as confidential to persons not entitled to have access to such documents).[2] They also argue that because the Contempt Motion is not a dispositive motion (apparently meaning by that, that it is neither a motion to dismiss, nor a motion for summary judgment), and because the Contempt

---

[2] As a general matter, documents exchanged in discovery and the records of interrogatories and depositions are not judicial records. *E.g. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (". . . depositions and interrogatories are not public components of a civil trial"); *Bond v. Utreras*, 585 F.3d 1061, 1066 (7th Cir. 2009) (no common law or constitutional right of access to pretrial discovery documents exchanged between parties but not later filed with court).

**MEMORANDUM DECISION AND ORDER - 11**

Motion – and any filings related to the Contempt Motion – have been "withdrawn" by the parties, such records do not constitute adjudicative records.  In the first instance, then, the parties argue that a lesser, "good cause," standard applies to determine whether the documents should be sealed, and in the second instance, they argue that the documents are not judicial records and therefore are not presumptively public in nature.

This case presents novel facts – the Court has not identified and the parties have not referred the Court to any judicial decisions involving a similar backdrop.  There is no particular civil rule that would cubbyhole a "Motion for Order to Show Cause Why Defendant Should not be Held in Contempt of Court's Order" as either dispositive or non-dispositive in nature, such as if the motion specifically invoked Rule 12, or Rule 56, as distinct from Rule 26, for instance.  Indeed, the Motion itself makes no mention of any rule, nor does the memorandum in support.  (Docket Nos. 116, 116-1).  In similar settings, courts have examined the substance of the filings, rather than the title, to make a decision as to whether or not they "go to the merits of the case and are not tangentially related to the cause of action."  *E.g., FTC v. AMG Services, Inc.*, 2012 WL 3562027, *1 (D. Nev. 2012).

The Court has made such an examination in this case, and concludes that the Contempt Motion and the related filings in support and against, are much more directed to the merits of the case than they are tangentially related to the cause of action.  The Court reaches this conclusion because a complete reading of all of the documents reveals that the purported discovery dispute – *i.e.*, the alleged violation of the Protective Order, and corollary arguments about work product or attorney-client protections – is simply a pedestal for the real purpose of the Contempt Motion, which seeks case-dispositive sanctions against ILM, is used as means of further arguing the

**MEMORANDUM DECISION AND ORDER - 12**

merits of Empire's Claims against ILM, and which attempts to further color the waters of the record in favor of Empire. Empire filed its Contempt Motion as summary judgment motions were pending, and, in doing so, repeated the alleged bad acts of ILM and added to such a list the alleged bad acts of ILM's counsel. Consider the following details about the Contempt Motion, and its supporting materials:

- The motion asks the Court to impose sanctions, "inclusive of but not limited to the striking of ILM's answer and defenses of any nature." (Docket No. 116).

- The memorandum in support only in part discusses the details of the Protective Order and the allegations as to how its provisions allegedly have been violated, but then goes on to discuss Idaho criminal statutes prohibiting witness intimidation. Then, stating that "the context of the offending [Hull Letter] also has to be put in place," Empire's memorandum devotes the great bulk of the content of the memorandum to enlarging and repeating Empire's claims about the alleged mishandling and malfeasance in the adjusting and payments made upon Empire's loss. (Docket No. 116, Att. 1).

- Empire attaches over 170 pages of "exhibits" in support of the Contempt Motion, containing the Hull Letter and e-mail communications between counsel and the discovery master, but also dozens of pages of internal ILM claim file notes, emails exchanged between ILM and reinsurers, internal ILM financial condition records, and excerpts from depositions. (Docket No. 116, Att. 2 through Att. 12).

As would be expected (and entirely appropriately so), ILM's response was also lengthy and similarly detailed – the relief sought by Empire, after all, was effectively to cut off ILM's defense of the case at the knees, and to inflict injury to the professional reputation of ILM's attorneys. (Docket No. 146). In addition to the written memorandum in response, declarations of both Mr. Schroeder and Mr. Hull were submitted, as were multiple exhibits totaling nearly 700 pages of email communications, deposition testimony, and other materials. But the response was

**MEMORANDUM DECISION AND ORDER - 13**

also in large part far afield from the supposed frontal issue of the Contempt Motion, *i.e.*, whether the Protective Order had been violated. A large part of the memorandum in response to the Contempt Motion was devoted to describing the factual and legal basis supporting ILM's argument (as first detailed in the Hull Letter, which precipitated the Contempt Motion). This included repeats of and enlargement upon ILM's contentions that the Moloney O'Neil Agency had violated contractual and fiduciary duties it owed to ILM, that its principals had committed various bad acts in the submission of the claims of loss on behalf of Empire to ILM, and that they had wrongfully collaborated with Empire's attorney along the way. In the argument section devoted more specifically to the issue of whether the Protective Order had been violated, ILM argued quite strenuously that the information allegedly mishandled by ILM was not subject to Rule 26(c) (discovery protective orders) protection, that the information was not "confidential" in the first place, and that even if "confidential," Empire Lumber had already spread such information about the record in its earlier filings.

The overall nature of ILM's filings on the Contempt Motion was somewhat different than those of Empire. Understandably, both Mr. Schroeder and Mr. Hull needed to respond to the accusations leveled at them by Empire and its counsel, and the ILM filings contain a vigorous argument as to why Empire's claims were meritless in their view. However, ILM's filings, as Empire's, also were an attempt to color the waters of the record. ILM sought to make the Moloney O'Neil agency, and its principals, appear to be untrustworthy, sought to leave inferences that the merits of the Empire claim in its entirety was suspect, and sought to discredit Empire's counsel, Mr. Brown, by suggesting that when Moloney O'Neil witnesses were making

**MEMORANDUM DECISION AND ORDER - 14**

allegedly false or materially incomplete statements in their depositions, Mr. Brown, knew that such statements were incorrect, but sat silent.

The ILM filings in opposition to the Contempt Motion led to further filings by Empire. (Docket No. 155). A portion of the reply brief discusses the discovery dispute that seemed to continue to float among the charges and countercharges that were the primary focus of the briefing, but much of the reply brief remained focused on countering the alleged 'bad acts" of the principals of the Moloney O'Neil agency, and to the attack directed at Empire's counsel. In his conclusion, Mr. Brown dismisses ILM's opposition in saying: "ILM and Mr. Hull's response is gross hyperbole and spin control to serve ILM's agenda and not that of the Court's. ILM's conduct toward its insured from the date of the fire has been abhorrent and ILM's switching of tactics in this litigation beginning with the November 28, 2012, letter as authored by Mr. Hull is a continuation of such tactics." (Docket No. 155).

In essence, Mr. Brown recognizes that ILM – in response to his Contempt Motion – has done exactly what ILM would suggest that Empire was attempting to do in bringing the Contempt Motion – engage in "hyperbole and spin control to serve [ILM's] [Empire's] agenda, and not that of the Court's." That characterization fits the Contempt Motion generally, and the related filings from both sides, including from Empire. Hence, when considered in the context of the approaching trial date, the pending cross motions for summary or partial summary judgment, and the pending motions relating to evidentiary issues, it is inescapable in the Court's view that the Contempt Motion (and its related filings from both parties) were directed at the merits of the case and were not merely tangentially related to the claims at issue in the lawsuit. Empire asked in its Motion for sanctions that would have left ILM without any ability to defend

**MEMORANDUM DECISION AND ORDER - 15**

itself at trial. Empire repeated its attack upon the integrity of ILM's claim handling process, added new allegations in that regard, and sought to discredit its counsel as well. ILM, in the prelude to Empire's Contempt Motion, launched a full broadside attack in the Hull Letter upon the insurance agency which had placed the policy issued to Empire, the two principals of the agency who were important witnesses for the Plaintiff, and slung its own arrows toward Empire's counsel. ILM did so with claims and demands that raised threats to the financial well-being of the agency and to the reputation of the principals of the agency.

The parties were able to settle this lawsuit, and they and their counsel are commended for doing so, as it must have been a difficult task. However, the Contempt Motion and the related filings were filed long before that settlement occurred. There was no request from either party to seal all or any portion of the documents that made up that part of the Court's record in this case. (The very fact of the public nature of such filings is often a strategic decision in such settings.) The matters raised by the Contempt Motion (and the Hull Letter which was the purported trigger for the Contempt Motion) were not ancillary to the merits of the lawsuit, and they did not involve the sorts of remote matters and the documents related to such that could reasonably be considered non-judicial records. The Contempt Motion filings do contain serious accusations directed at counsel for both parties, by opposing counsel, and serious accusations directed at a business, and businessmen, who were part of the factual underpinnings of the lawsuit. The accusations were contested and answered in the opposing filings. Paradoxically, in the context of the claims raised in the Hull Letter against the Moloney O'Neil agency, and two of its principals, such information might not have made its way into the public records of a federal court if they had not been made a partial subject of the Contempt Motion. However, an attorney

**MEMORANDUM DECISION AND ORDER - 16**

who writes such a letter, particularly when it contains threats of litigation directed against key witnesses in a related, high-stakes, civil lawsuit soon to go to trial, should recognize that such a letter might well find its way into the courtroom.

The court records of the Contempt Motion reflect a contentious lawsuit, wrestling over claims involving large amounts of money, with things said about businesses and people in publicly-filed judicial records that likely were filed reluctantly and which, in hindsight, are uncomfortable to leave where deposited. However, in the appropriate way guaranteed by the adversarial process, such matters have been addressed and argued by both sides, and the record reflects that. Ultimately, the record of such things reflects part of the bruises and battle of some lawsuits, and there can be no expectation of protection from or privacy about such things as a general rule, nor as a particular holding here. Although the presumption of openness may properly give way to protect someone against the improper use of court records "to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets," it is not sufficient to overcome that presumption to protect against the possibility of embarrassment, incrimination, or further litigation. *Kamakana* at 1179.

The Court holds that the records relating to the Contempt Motion, sought to be sealed by the Joint Motion to Seal, are judicial records subject to the presumption of openness. This is not altered by the fact that the Court ultimately did not rule upon the Contempt Motion. If the fact of whether a court has ruled on a particular motion became the determinant between whether the records of such a motion are open, or subject to be sealed based on a showing of good cause, then parties could seek to routinely seek to seal the records of dispositive motions, including summary judgment motions or motions to dismiss, simply for the reason that the parties had

**MEMORANDUM DECISION AND ORDER - 17**

settled a case before the motion was ruled upon. Such a rule would be harmful to the critical role that transparency plays in maintaining public confidence in our courts – here, the basic notion that every party and every attorney filing any document with the Court understands that, except in very narrowly-defined exceptions, the document is presumed to be open for any person to see, and the public can see and understand from such records the bases from which the decisions in such cases are drawn.

### III.  ORDER

For the reasons described herein, the Court holds that the records contained in the Docket filings referenced in the Joint Motion to Seal are judicial records, subject to a presumption of public access. The Court further finds that the parties have not presented a sufficient showing of compelling reasons to overcome that presumption as to any one or more of the documents sought to be sealed. Accordingly, the Joint Motion to Seal (Docket No. 163) is DENIED.

The Court previously issued an order sealing the documents referenced by the Joint Motion to Seal, so as to create the sealed status requested by the parties until the Court decided the motion. The Court will order that this Memorandum Decision and Order be sealed until the expiration of any appeal period and, if it is appealed, until resolution of any such appeal. Likewise, the Motion to Seal, as well as all documents to which it refers, shall also remain sealed

///

///

///

///

until the expiration of any appeal period and, if it is appealed, until the resolution of any such appeal.



DATED: **August 13, 2013**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 19**